IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

PENNY K. YOHE,

        Plaintiff,

      v.                             Civil Action No. 5:09-CV-75

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

Plaintiff, Penny Yohe (Claimant), filed a Complaint on July 7, 2009, seeking Judicial

review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of

Social Security, (Commissioner).[1]  Commissioner filed his Answer on October 8, 2009.[2]

Claimant filed his Motion for Summary Judgment on November 9, 2009.[3]  Commissioner filed

his Motion for Summary Judgment on December 7, 2009.[4]

B.    <u>The Pleadings</u>

    1.    <u>Plaintiff's Brief in Support of Claim for Relief.</u>

---

[1] Docket No. 1.

[2] Docket No. 8.

[3] Docket No. 13.

[4] Docket No. 15.

2. <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C. <u>Recommendation</u>

I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** because there was substantial evidence to support the ALJ's determination that balancing be included in Claimant's RFC, Claimant maintained the ability to perform the jobs listed by the VE, and Claimant's fibromyalgia and Meniere's disease did not worsen during the relevant period, and the ALJ properly evaluated the medical evidence of record, Claimant's credibility, the relevant listings, and the testimony of Claimant's witness.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II. Facts

A. <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DBI) and Supplemental Security Income (SSI) on January 27, 2006, alleging disability due to fibromyalgia, Meniere's disease, diabetes mellitus, and mood/panic disorders beginning November 1, 2005. (Tr. 60). The claim was denied initially on April 6, 2006, and upon reconsideration on October 4, 2006. (Tr. 54, 50). Claimant filed a written request for a hearing on November 22, 2006. (Tr. 49). Claimant's request was granted and a hearing was held on November 8, 2007. (Tr. 31-34; 606-652).

The ALJ issued an unfavorable decision on December 19, 2007. (Tr. 15-27). The ALJ determined Claimant did not have an impairment or combination of impairments that meets or

medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 416.920(d), 416.925 and 416.929), and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR 416.960(c) and 416.966). (Tr. 22-26). On January 4, 2008, Claimant filed a request for review of that determination. (Tr. 14). The request for review was denied by the Appeals Council on May 27, 2009. (Tr. 6-8). Therefore, on May 27, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on October 25, 1965, and was forty (40) years old as of the onset date of his alleged disability and forty-two (42) as of the date of the ALJ's decision. (Tr. 60). Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations at the time of her onset date and at the time of the ALJ's decision. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009). Claimant earned college credits at a community college and received training in the Air Force. (Tr. 614-15). Claimant has previous work experience as an aid on a farm and an attendant at a public library. (Tr. 615-18).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Medical Source Statement of Ability to do Work-Related Activities (Physical), Miguel Estevez, MD, 10/23/04 (Tr. 390-93)**

- exertional limitations
  - occasionally lift: 20 pounds
  - frequently lift: 10 pounds
  - hours of walking (with normal rest breaks): at least 2 hours in an 8-hour workday
  - must periodically alternate sitting and standing to relieve pain and discomfort
  - pushing/pulling: limited in upper and lower extremities
- postural limitations:
  - climbing: occasionally
  - balancing: never
  - kneeling: never
  - crouching: occasionally
  - crawling: never
  - must rest, recline, or lie down several times/day
  - must elevate legs above the heart several times/day
  - takes medications which would interfere with ability to do work
- manipulative limitations:
  - reaching: unlimited
  - handling: unlimited
  - fingering (fine manipulation): limited
- visual/communicative limitations:
  - seeing, hearing, speaking: limited
- environmental limitations:
  - temperature extremes, noise, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals, gases: limited
- limitations can be expected to last for 12 months or longer
- allegations of pain are consistent with medical findings

**Mental Residual Functional Capacity Assessment, G. David Allen, 3/28/06 (Tr. 249-52)**
- understanding and memory:
  - ability to remember locations and work-like procedures: not significantly limited
  - ability to understand and remember very short and simple instructions: not significantly limited
  - ability to understand and remember detailed instructions: not significantly limited
- sustained concentration and persistence:
  - ability to carry out very short and simple instructions: not significantly limited
  - ability to carry out detailed instructions: not significantly limited
  - ability to maintain attention and concentration for extended periods: moderately limited
  - ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances: moderately limited
  - ability to sustain an ordinary routine without special supervision: no evidence of limitation
  - ability to work in coordination with or proximity to others without being distracted by them: moderately limited

- ability to make simple work-related decisions: no evidence of limitation
- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited
- social interaction:
  - ability to interact appropriately with general public: markedly limited
  - ability to ask simple questions or request assistance: no evidence of limitation
  - ability to accept instructions and respond appropriately to criticism from supervisors: not significantly limited
  - ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes: not significantly limited
  - ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: no evidence of limitation
- adaption:
  - ability to respond appropriately to changes in work setting: not significantly limited
  - ability to be aware of normal hazards and take appropriate precautions: no evidence of limitation
  - ability to travel in unfamiliar places or use public transportation: markedly limited
  - ability to set realistic goals or make plans independently of others: no evidence of limitation
- functional capacity assessment: credible evidence to support severe mental impairments consisting of panic with agoraphobia and major depression. Impairments do not meet or equal the listings. Impairments adversely impact several work-related functional domains but claimant retains emotional and mental functioning such that she is able to work in settings of low pace, which do not involve travel to unfamiliar places

**Psychiatric Review Technique, G. David Allen, Ph.D., 3/28/06 (Tr. 253-66)**
- Medical Summary:
  - medical dispositions: RFC assessment necessary
  - categories upon which medical disposition is based: 12.04 affective disorders; 12.06 anxiety-related disorders
- 12.04 disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by:
  - depressive syndrome characterized by:
    - anhedonia or pervasive loss of interest in almost all activities
    - sleep disturbance
    - feelings of guilt or worthlessness
    - difficulty concentrating or thinking
    - thoughts of suicide
- 12.06 anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms as evidenced by: recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week

- functional limitations
  - restriction of activities of daily living: mild
  - difficulties in maintaining social functioning: moderate
  - difficulties in maintaining concentration, persistence, or pace: moderate
  - episodes of decompensation, each of extended duration: none
- consultant notes: symptoms of depression and panic attacks due to fibromyalgia; receives mental health treatment and takes medication for depression. Medical and non-medical evidence partially credible. Supported by mostly normal mental status and relief of depression symptoms with medication.

## **Consultative Evaluation Report Adult Mental Status Exam, Barbara Rush, 7/21/06 (Tr. 267-71)**

- chief complaints: stressed; vertigo, bad memory
- mental status examination:
  - appearance: neat, clean, casually dressed
  - attitude/behavior: pleasant, friendly, cooperative
  - eye contact: good
  - speech: clear, spontaneous, very talkative, rambling at times
  - orientation: x3
  - mood: reported feeling anxious and depressed but denied symptoms of mania
  - affect: animated
  - psychomotor behavior: normal
  - gait: mildly restless
  - thought processes: tangential; needed frequent redirection; no evidence os psychotic processes
  - thought content: focused upon her history of abuse and numerous medical conditions
  - insight: fair
  - judgment: fair
  - suicidal/homicidal ideation: none
- Memory: immediate - normal; recent - mildly deficient; remote - mildly deficient, referred to notes for dates; concentration - mildly deficient; persistence - trouble with train of thought; pace: speech was rapid
- diagnoses:
  - Axis I:                      296.90 mood disorder, not otherwise specified
  -                              300.21 panic disorder with agoraphobia
  - Axis III:      per report - fibromyalgia, Meniere's disease, restless leg syndrome, stomach ulcer, irritable bowel syndrome
  - Axis IV:      psychosocial stress level: moderate
  - Axis V:      55
- prognosis: fair

## **Psychiatric Review Technique, Philip Comer, Ph.D., 8/11/06 (Tr. 272-84)**

- Medical Disposition:

- RFC assessment necessary
- categories upon which the medical disposition is based:
  - 12.04 affective disorders - Mood D/O NOS
  - 12.06 anxiety-related disorders - anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by: recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week
- functional limitations
  - restriction of activities of daily living: mild
  - difficulties in maintaining social functioning: moderate
  - difficulties in maintaining concentration, persistence, or pace: mild
  - episodes of decompensation, each of extended duration: none
- consultant's notes: partially credible

## Mental Residual Functional Capacity Assessment, Philip Comer, Ph.D., 8/11/06 (Tr. 285-88)

- understanding and memory:
  - ability to remember locations and work-like procedures: not significantly limited
  - ability to understand and remember very short and simple instructions: not significantly limited
  - ability to understand and remember detailed instructions: not significantly limited
- sustained concentration and persistence:
  - ability to carry out very short and simple instructions: not significantly limited
  - ability to carry out detailed instructions: not significantly limited
  - ability to maintain attention and concentration for extended periods: moderately limited
  - ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances: not significantly limited
  - ability to sustain an ordinary routine without special supervision: not significantly limited
  - ability to work in coordination with or proximity to others without being distracted by them: moderately limited
  - ability to make simple work-related decisions: not significantly limited
  - ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited
- social interaction:
  - ability to interact appropriately with general public: moderately limited
  - ability to ask simple questions or request assistance: not significantly limited
  - ability to accept instructions and respond appropriately to criticism from supervisors: not significantly limited
  - ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes: not significantly limited

- ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: not significantly limited
- adaption:
  - ability to respond appropriately to changes in work setting: moderately limited
  - ability to be aware of normal hazards and take appropriate precautions: not significantly limited
  - ability to travel in unfamiliar places or use public transportation: moderately limited
  - ability to set realistic goals or make plans independently of others: not significantly limited
- functional capacity assessment: limitations do not exceed moderate and do not call for a RFC allowance. Claimant has mental emotional capacity for routine/ repetitive activity in a low stress/demand work environment that does not require travel in unfamiliar settings

## Physical Residual Functional Capacity Assessment, Cindy Osborne, DO, 10/4/06 (Tr. 289-96)

- primary diagnosis: fibromyalgia
- secondary diagnosis: Meniere's disease
- exertional limitations:
  - occasionally lift: 20 pounds
  - frequently lift: 10 pounds
  - stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
  - sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
  - push and/or pull (including operation of hand and/or foot controls): unlimited
- postural limitations:
  - climbing ramp/stairs: frequently
  - climbing ladder/rope/scaffolds: never
  - balancing: frequently
  - stooping: frequently
  - kneeling: frequently
  - crouching: frequently
  - crawling: frequently
- manipulative limitations: none
- visual limitations: none
- communicative limitations: none
- environmental limitations:
  - extreme cold: unlimited
  - extreme heat: unlimited
  - wetness: unlimited
  - humidity: unlimited
  - noise: unlimited
  - vibration: unlimited

- • fumes, odors, dusts, gases, poor ventilation: unlimited
- • hazards: avoid even moderate exposure
- • comments: partially credible; PE is essentially normal

**Emergency Room Record, Reynolds Memorial Hospital, 7/31/07 (Tr. 308-10)**
- • left lower abdomen pain; some nausea, fever, bleeding
- • diagnostic impression: abdominal pain - acute painful ureterolithesis

**Lab Results, Reynolds Memorial Hospital, Department of Radiology, 7/31/07-8/1/07 (Tr. 299-307)**
- • abdomen - gas pattern is nonspecific; no evidence of obstruction or free air; no radiopaque calculi or soft tissue masses are noted
- • impression: normal abdomen
- • CT scan of abdomen without contrast: fatty infiltration of liver; dilatation of left renal collecting system and a tiny calculus at left ureterovesical junction; no other radiopaque calculi noted. Fatty infiltration of liver; other abdominal, pelvic, and retroperitoneal structures are unremarkable. No mass or lymphadenopathy. Infiltration of left perinephric fat and also infiltration around left renal pelvis and left ureter
- • impression: 2 to 3 mm calculus at left ureterovesical junction producing mild obstructive uropathy
- • left kidney stone: renal and psoas margins are well delineated; no radiopaque calculi seen
- • impression: possible slight residual dilatation of left ureter, but no significant hang-up of contrast in erect position.

**Consultation, Reynolds Memorial Hospital, Dr. Nally, 8/1/07 (Tr. 297-98)**
- • chief complaint: left flank pain
- • impression: left ureteral stone; possible spontaneously passed; questionable perirenal extravasation
- • recommendation: IV urogram

**Problem List, PA VAMC (Tr. 424-30)**
- • headache - entered 2/2/00
- • depressive disorder - entered 3/27/00
- • sebaceous cyst - entered 8/28/02
- • urticaria nos - entered 8/28/02
- • migraine unspec without interaction - entered 8/28/02
- • arthropathy - entered 12/27/02
- • fibromyalgia - entered 12/31/03
- • GERD - entered 12/31/03
- • pain in joint involving hand - entered 2/9/05
- • vertigo - entered 5/24/05
- • costochondritis - entered 7/7/06
- • insomnia - entered 7/15/06
- • calcaneal spur - entered 12/21/06

- diabetes mellitus without mention of complication, type II or unspecified type - entered 6/19/07
- mixed hyperlipidemia - entered 6/19/07
- abdominal pains - entered 1/10/08
- obesity in diabetes - entered 6/19/07

## Progress Notes and Consult Requests, PA VAMC, 5/29/03-10/31/06 (Tr. 331-62)

5/29/03
- history of migraine headaches and stomach ulcers
- assessment/plan: patient appeared to have fibromyalgia; does not appear to have lupus

7/7/04
- chief complaint: difficulty sleeping
- physical examination: alert; oriented; pleasant; in no acute distress
- assessment/plan: continue medication; lose weight

7/7/06
- chief complaint: fibromyalgia; pain; trouble moving because of stiffness
- review of systems: denies weight changes, malaise, fatigue, fever, chills, night sweats
- physical exam: pain level of seven - mainly on right side of chest
- general: pleasant; well-nourished; alert; oriented; cooperative; no apparent distress
- impression/plan: continue medications; counseled for modified carbohydrate diet

9/19/06
- patient called - frequent urination, excessive thirst, blurred vision; memory and concentration problems

10/27/06
- patient called - blurred vision; can't read or drive; diagnosed with diabetes
- blurred vision will not be under control until sugar gets under control

10/31/06
- meeting to discuss diabetic diet

## Progress Notes and Consult Requests, Pittsburgh VAMC 2/9/05 - 6/20/06 (Tr. 142-228)

2/9/05
- chief complaint: hand pain
- physical exam: no acute distress; mildly positive Tinel sign; no tenderness to palpation over the wrist; right 5th finger noted to have swelling at proximal interphalangeal joint with associated ecchymosis and decreased range of motion
- assessment/plan: assess x-ray
- x-ray: S/P right hand trauma with pain at the fifth PIP joint with mild edema and eccymosis; no other abnormality noted on the x-ray

3/28/05
- chief complaint: night splints and fibromyalgia; relates history of being unhappy and depressed
- physical exam: interactive lady - somewhat nervous; swelling in PIP joint of little finger; good grip bilaterally; no muscle atrophy in hands
- assessment: numbness in hands, possibly carpal tunnel syndrome; muscular pain mainly

in neck and shoulders - possibly fibromyalgia; depression; urinary urgency; vaso motor instability or hot flashes
- plan: cervical spine x-rays; evaluation in rheumatological clinic; set up electromyelogram studies

3/31/05
- x-ray of cervical spine
- no acute changes

4/4/05 Psychosocial Assessment
- psychiatric history: unsure if she's even seen psychiatrist; reports seeing local CMH counsel for a few years in the early 1990s
- emotional state: alert, oriented, responsive, conversant, cooperative, depressed, resistant to care; spontaneous speech - somewhat rapid and pressured; good eye contact; mildly depressed mood; appropriate affect; denied S/H ideation, hallucinations, delusions, or manic symptoms; oriented x3; memory intact; attention and concentration were good; insight and judgment fair; no formal thought disorder ; gradually decreasing energy, motivation, ability to enjoy life, and social interaction; occasional intrusive daytime fears
- social work plan of treatment: agree to try to use Behavioral Health walk-in clinic; declined offer of Behavioral Health consult; willing to consider trial on another anti-depressant

4/4/05
- declined offer of additional therapy sessions and refused offer of Behavioral Health consult
- willing to consider trial on another anti-depressant; agreed to use Behavioral Health walk-in clinic
- not suicidal; complains primarily of emotional numbness, lethargy, apathy, and poor sleep

5/2/05 telephone call
- reported not visiting Behavioral Health walk-in clinic yet
- reported fair sleep despite pain; good appetite
- denied suicidal ideation or any thoughts of self-harm

5/24/05
- chief complaint: sick feeling; dizziness; ears are plugged; nauseated
- physical exam: not in any pain; pleasant, well-nourished, alert, oriented, cooperative; no apparent distress
- impression/plan: no benign paroxysmal positional vertigo by testing; neurological consult for further evaluation of migraines, cephalgia, and vertigo; allergic rhinitis; muscle spasms; refused social services consult; accepted neurology consult

6/7/05
- chief complaint: evaluation for possible complex migraine with nausea and vertigo
- review of systems: no systemic problems other than as mentioned with nausea and vertigo
- mental status: awake, alert, oriented
- assessment/plan: history of migrainous type headaches now presenting with symptoms of nausea and vertigo; possibility of vertebral basilar migraine; family history of Meniere's

disease - concern here because of problems with ears; send for audiology evaluation

6/7/05 Initial Psychological Examination

- mental status/emotional and behavioral appraisal: alert and oriented in all spheres; adequate and appropriate grooming and hygiene; dysphoric mood with somewhat flattened affect; relevant, coherent speech; reports being "depressed all the time;" reports having migraine headaches "all the time;" good appetite; trouble sleeping; no suicidal ideation; no delusions; some mild obsessive-compulsive symptoms; afraid to drive because of falling asleep at the wheel
- diagnostic impression: Axis I - major depressive disorder, recurrent, mild; Axis II - deferred
- treatment/plan: enroll in Beta Primary Care

7/15/05

- chief complaint: drowsiness during the day; restless leg syndrome
- review of systems: denies recent weight changes, malaise, fatigue, fever, chills, night sweats
- physical exam: level three pain today - tolerable
- general: pleasant, well-nourished, alert, oriented, cooperative, no apparent distress
- impression/plan: fibromyalgia has worsened; drowsiness; changed medication because medicine helping her with fibromyalgia and restless leg syndrome has increased her drowsiness; therefore, fibromyalgia has worsened

7/23/05

- chief complaint: worsening fatigue; denies hx of SI; denies current SI/HI, irritability

9/15/05

- chief complaint: cannot drive by herself because she falls asleep; pain, myalgia, and fatigue are worsening; not in real pain but having trouble moving
- review of systems: denies recent weight changes, malaise, fatigue, fever, chills, night sweats; admits to headaches and vertigo; vertigo decreasing
- physical exam: level five pain; generalized pain; not really a pain but a problem moving around; tendinitis in elbow; states if she could get sleep at night she would feel better
- general: pleasant, well-nourished, alert, oriented, cooperative, no apparent distress
- impression/plan: fibromyalgia; generalized pain accepted rheumatology consult; emphasized her need to be seen at Highland Drive for psychiatry and neurology to adjust her medications for her depression

9/18/05

- chief complaint: followup of vertigo and hearing-related issues associated with headaches
- mental status: awake, alert, oriented; answering questions; following commands; slightly decreased and depressed affect
- assessment and plan: vertigo episodes have resolved substantially - continue medication; begin medication to address anxiety disorder and restless leg syndrome; complete audiology exam to confirm or rule out Meniere's disease

12/28/05

- chief complaint: depression
- mental status examination: relates well; good eye contact; little anxious; no agitation; sleep problems; difficulty in crowds; difficulty with concentrating; denies paranoid

thoughts; exhausted; good insight; good judgment
- impression:  major depression, GAD/ Panic disorder with agorophobia, R/O Dysthymia, r/o Bipolar II
    - Axis III: fibromylagia, migraine, H/o peptic ulcer, Meniere's disease
    - Axis IV: moderate - health problems, poor finances, fear of losing house
    - Axis V: 55
- plan: readjust med to stabilize mood, sleep, and anxiety

1/18/06
- patient called - not sleeping; hot flashes; pain in back of head down neck and into shoulders; disoriented feeling intermittently

2/2/06 audiologic evaluation
- chief complaint: hearing loss in right ear; ringing and can hear heartbeat; dizziness
- hearing loss description: results of audiologic evaluation revealed normal hearing sensitivity in left ear and mild ensorineural hearing loss in right ear
- recommendations: vestibular testing; patient not interested in hearing aid evaluation right side; ENT consult

2/2/06 audiology- video electronystagmography consult
- oculomotor screening battery: normal
- horizontal saccades demonstrated normal peak velocities, accuracies and latencies; horizontal tracking gains were normal for leftward and rightward moving targets; optokinetic nystagmus normal and symmetric; no gaz nystagmus noted
- static positional testing: normal; no mystagmus in any head position
- hallpike maneuver: normal; no response with either ear down
- alternative binaural bithermal caloric irrigations: normal; caloric responses were robust and symmetric; caloric fixation suppression normal
- impression: normal EKG; clinical correlation is necessary

2/21/06 individual therapy
- mental status exam: alert; dressed casually; relates well; little anxious; no agitation; denies panic symptoms; denies h/o AV or command hallucination; fair appetite; denies thoughts of suicide; difficulty sleeping; speech is clear and goal-oriented; denies being impulsive
- impression: major depression, R/O bipolar disorder, h/o GAD, r/ panic disorder
- plan: needs ongoing support to deal with health issues; can benefit from therapy but is not able to come

3/9/06 ENT consult
- dizzy spells lasting between 30 minutes to 6 hours in duration; right ear fullness; right-sided hearing loss
- physical exam: left and right ears demonstrated TMs that were clear and intact with no evidence of effusion in middle ear space; EACs were likewise clear with no evidence of inflammation or infection bilaterally
- assessment/plan: findings consistent with Meniere's disease; continue diuretic medications; eat low-salt diet

4/19/06
- assessment and plan: mild asymmetric hearing loss in right ear; unusual that her

electronystagmography was normal; vertiginous symptoms with migraine are common and not always occurring in direct relation to headache; order brain MRI with internal auditory canal evaluation

6/13/06
- patient called: fibromyalgia is worse; increased pain in wrists, hands, back and knees

6/20/06 individual therapy
- pain due to fibromyalgia; off and on panic attacks; feels anxious; scared to travel alone
- dressed casually; personal hygiene is okay; good eye contact; little anxious; no agitation; affect is appropriate; speech is clear and goal-directed; denies feeling helpless; denies thoughts of hurting herself or others; good insight; judgment is good; good insight; good judgment; denies side affect
- impression: major depression - mild
- plan: needs ongoing support

**Progress Notes, VA Pittsburgh Healthcare System, 12/21/06-7/26/07(Tr. 313-30)**

12/21/06
- subjective: left heel pain
- assessment: plantar fasciitis, left foot; fibromyalgia
- plan: stretch and ice twice/day

3/15/07 individual therapy
- mental assessment: dressed casually; personal hygiene is good; not anxious or agitated; affect is appropriate and somewhat bright; feels sad, depressed; trouble sleeping; denies feeling helpless or hopeless, having racing thoughts, being suicidal; appetite is fair; good insight and judgment
- depression: MDD- mild
- plan: needs ongoing support; can benefit from therapy, but is not able to go

4/10/07
- chief complaint: followup of migrainous-type headaches and vertigo
- physical exam: awake, alert, oriented; normal standard gait
- assessment/plan: continue current medications

5/24/07
- complaint: fullness sensation and humming tinnitus in right ear that seems to be louder; thinks hearing sensitivity is getting worse
- test results show slight but not significant threshold shift in both ears; slight to mild sensorineural loss in left ear and a mild to moderate sensorineural loss in right ear; no visible ear canal or eardrum abnormalities in either ear
- assessment/plan: patient not interested in hearing aid

5/31/07
- subjective: pain in balls of both feet and left heel pain
- assessment: neuroma bilateral fourth interspaces; left heel spur
- plan: injections at bilateral fourth interspaces for neuromas and left heel plantar fascial insertion

6/19/07
- chief complaint: check-up

- review of systems: some chronic fatigue - associated with fibromyalgia; denies recent weight change, fever, chills, night sweats; obese; alert, oriented; ambulatory
- impression/plan: continue medications

7/26/07 individual therapy
- mental status exam: dressed casually; personal hygiene is okay; little anxious; no agitation; affect is appropriate; speech is clear and goal-oriented; denies feeling helpless or hopeless, having thoughts of hurting self or others; sometimes feels anxious; denies panic symptoms; fair appetite; needs help sleeping; good insight and judgment
- depression: MDD-mild
- plan: needs ongoing support; discuss therapy - but patient is unable to go

**Progress Notes, PA VAMC, 10/23/07 - 11/1/07 (Tr. 400-12)**
8/15/07
- patient called - wants to see someone for local supportive therapy

8/16/07
- subjective: presents for follow-up of neuroma pain; relates she is no longer having pain in balls of her feet but is having some burning pain that comes down back of her leg and goes into the tops of her feet
- assessment: radiculopathy bilateral lower extremities; resolved heel spur; resolved neuroma
- plan: placed on Voltaren

8/16/07 individual therapy
- general: casually dressed; adequate grooming and hygiene; speech was slow, spontaneous, relevant, goal-directed; had several lapses where she lost her train of thought; good eye contact
- objective: oriented x3; memory admittedly poor; mood was dysphoric with sad, nervous affect; denied ideation, delusions, hallucinations or manic symptoms; fair attention and concentration; insight fair; judgment intact; intelligence in average range
- diagnostic impression:
  - Axis I:                    depressive disorder
  - Axis IV:        moderate/severe - chronic physical pain/limitations, lack of income, uncertainty about future, strained relationship, childhood issues
  - Avis V:        60
- plan: take medications; keep appointments; try relaxation techniques; use journal for externalization; continue with list-making

9/18/07
- patient noted she is following ADA diet "most of the time;" having some episodes of hypoglycemia; discussed nutritional suggestions to treat hypoglycemia
- patient losing weight
- discussed low cholesterol diet

10/16/07
- patient called complaining of memory problems; patient did not show up for appointment with neurologist today; alternates between saying her memory and pain causes her to

forget things
- patient called complaining of increased pain in left foot, knees, back, hands, neck, shoulders

11/1/07 individual therapy
- impression: MDD-mild; GAF - 55-60
- plan: needs ongoing support

**Progress Notes, PA VAMC 2/4/08-2/14/08 (Tr. 583-600)**
2/4/08 podiatry consult
- objective: HEENT: normal; no edema; normal neuro
- impression: no evidence of acute lung infiltrates; cardiac shadow is within normal limits; no evidence of large pleural effusion or pneumothorax; minimal degenerative changes of the thoracic spine
- assessment: plantar fascitis (left foot) pre-op for plantar fasciotomy

2/5/08 individual therapy
- dressed casually; relates well; good eye contact; not anxious or agitated; affect is appropriate; speech is clear and goal-directed; sometimes feesl depressed; denies feeling helpless or hopeless; denies manic or hypomanic symptoms; good insight; good judgment
- impression: MDD mild
- plan: needs ongoing support; increase medications

2/6/08 pre-op
- objective: pedal pulses are palpable; 2/4 DP and PT bilateral; no varicosities noted; minimal amount of edema
- assessment: plantar fasciitis, left foot; limb length discrepancy; pain in limb; difficulty in ambulation
- plan: endoscopic plantar fasciotomy done of left foot

2/14/08
- patient complains of left heel pain - constant throbbing ache that throbs with increased activity

**Progress Notes, PA VAMC, 2/21/08-8/6/08 (Tr. 502-51)**
2/21/08
- no evidence of diabetic retinopathy

3/6/08
- complains of pain in left foot - aching, dull, pressure; mild cramping in dorsal lateral aspect of foot and Achilles tendon area
- objective: mild pain along lateral column of foot; mild pain to palpation of Achilles tendon; minimal pain to plantar fascial region over the incision site
- assessment: status post endoscopic plantar fasciotomy; doing well with mild pain
- plan: continue to try to walk normally on left foot

3/7/08
- patient called requesting hearing test

3/27/08

- pain in back, knees, shoulders, neck - aching, throbbing
- physical exam: some point tenderness over areas in right and left CVA; multiple skin tags around nape of her neck; some medial tenderness in knees
- impression/plan: fibromyalgia; chronic low back pain; bilateral knee condition; bilateral feet discomfort, perhaps diabetic neuropathy; watch caloric intake

4/8/08
- chief complaints: hearing loss in both ears getting worse; constant tinnitus in right ear; denies otalgia, otorrhea, ear infections, otologic surgery or prior hearing aid use
- hearing loss description: results of audiologic evaluation revealed mild to moderate sensorineural hearing loss in right ear and normal hearing sensitivity in left ear
- recommendations: discussed benefits of hearing aid

4/8/08
- subjective: 8 weeks status post endoscopic plantar fasciotomy of left heel; pain in area of surgery; denies fevers, chills, nausea, vomiting, or night sweats; denies shortness of breath, calf pain, or chest pain
- objective: mild pain along medial plantar fascia; mild pain to palpation of posterior heel
- assessment: doing well with mild pain
- plan: continue to stretch and ice

4/8/08
- chief complaint: followup of migraine headaches, vertigo, and fibromyalgia
- mental status: awake, alert, oriented
- assessment and plan?  Put on AED for migraine

4/29/08 individual therapy
- on-time; casually dressed; adequate grooming and hygiene; soft, spontaneous, somewhat fragmented speech; had word loss moments
- subjective: never feels happy; little interest or pleasure in life; low energy; poor motivation; periodic passive suicidal ideation; denied any plan or intention to harm herself; chronic pain issues; growing forgetfulness; variable sleep; can't make herself follow diabetic diet
- objective: oriented x3; memory reported as poor; no formal thought disorder; moderately depressed mood with blunted affect; periodic passive SI, denied any active intention to harm herself; attention and concentration fair; insight fair; judgment intact
- diagnostic impression:
  - Axis I: depressive disorder
  - Axis IV: moderate- chornic pain, limited income
  - Axis V: 65
  - plan: take medications; keep appointments

5/13/08 individual therapy
- on-time; casually dressed; adequate grooming; good hygiene; speech was spontaneous, relevant, goal-directed; good eye contact
- subjective: chronic knee pain; sad lately
- objective: oriented x3; memory reported as poor; no formal thought disorder noted; dysphoric mood with blunted affect; denied S/H ideation, delusions, hallucinations, or manic symptoms; fair attention and concentration; fair insight; judgment intact; average

range intelligence
- diagnostic impression
  - Axis I: depressive disorder NEC
  - Axis IV: moderate - chronic pain/ limitations, family and relationship issues
  - Axis V: 63
- plan: take medications; keep appointments; engage in hobbies

5/39/08 podiatry note
- subjective: post endoscopic plantar fasciotomy of left heel; increased pain in back of left heel; pain while at rest; cramping and "pins and needles" pain in legs and feet
- objective: no pain on palpation of heel; mild increase in edema/bursa to left posterior heel; no pain on palpation of feet or ankles bilaterally; no pain on side to side compression of bilateral heels
- assessment: bursitis left posterior heel; gastroc equinus bilaterally; neuropathic pain bilateral feet
- plan: order semirigid orthotics and a dorsal night splint

6/19/08 podiatry note
- subjective: increasing pain; inability to perform daily activities; complains of cramping and "pins and needles" pain in legs and feet
- assessment: left heel pain; gastroc equinus bilaterally; neuropathic pain, bilateral feet
- plan: wear night splint; given injection and prescription

6/20/08
- review of systems: weight is stable; chronically fatigued, perhaps related to fibromyalgia and depression
- physical exam: well-developed and nourished; pleasant; appears somewhat depressed
- impression/plan: continue medications

7/15/08
- affect: restricted; depressed; speech logical, relevant, and fluent
- subjective: concerned with worsening memory; foggy thinking; becoming disorganized
- plan: neurobehavioral evaluation; patient will consider discontinuing use of artificial sweeteners; begin daily walking exercise and improve nutrition

7/24/08
- presents for right ear pressure
- ear slightly red and slightly infected

8/6/08
- on-time; casually dressed; adequate grooming and hygiene; speech was soft, slow, and unproductive; word and thought lapses; variable eye contact
- subjective: depression worsening; increased feelings of worthlessness, uselessness, and sadness; excessive guilt
- objective: oriented x3; memory problematic; neurobehavioral evaluation arranged; moderately depressed with blunted affect; denied H ideation, delusions, hallucinations, or manic symptoms; fair attention and concentration; fair judgment; limited insight; average intelligence
- diagnostic impression:
  - Axis I: depressive disorder NOS

- • Axis IV: moderate/severe - limited income, abuse issues, chronic physical pain/ limitations, memory issues
- • Axis V: 57
- • plan: take medications; keep appointments; continue with reminders

## Progress Notes, PA VAMC 8/19/08-10/24/08(Tr. 442-74)

8/19/08 individual therapy
- • subjective: reports feelings of helplessness and worry; fair appetite; variable sleep; fair energy and motivation
- • objective: oriented x3; memory reportedly poor and has neurology and evaluation for ADD scheduled; no formal thought disorder noted; mildly depressed mood but with broader effect; denied ideation, delusions, hallucinations, or amnic symptoms; fair attention and concentration; intact judgment; fair insight
- • diagnostic impression:
  - • Axis I: depressive disorder NEC
  - • Axis IV: moderate/severe
  - • Axis V: 58

9/8/08 individual therapy
- • mental status exam: casually dressed; adequate grooming and hygiene; speech was slow, spontaneous, relevant, and goal-directed; good eye contact
- • subjective: fatigue; eyesight worsening; moodiness and irritability; fair sleep and appetite
- • objective: oriented x3; memory reportedly poor; some signs of mild confusion; no formal thought disorder; mildly depressed mood with subdued effect; attention and concentration fair/ insight fair/ judgment intact; intelligence of average range
- • diagnostic impression:
  - • Axis I: depressive disorder
  - • Axis IV: moderate-chronic pain/ limitations
  - • Axis V: 60

9/17/08
- • patient called - blood sugars are over 500; throat is sore; blisters on back of her tongue. Advised to go to ER; patient didn't want to drive to Pittsburgh

9/18/08
- • patient called office - visited ER today; blood sugar was 300+

9/25/08 and 10/2/08
- • behavioral observation: appeared overwhelmed at beginning of interview; generally appeared sad; oriented to day, date, place, and person; walked independently with a steady gait; does not use a hearing aid despite being offered the use of one; fluent speech at normal rate; volume of voice was soft and low; mood was periodically depressed and anxious with normal range of affect; expressed considerable frustration with memory; cooperative; motivated to perform well
- • test results:
  - • tasks that tend to be unaffected by acquired brain injury (WRAT-3 and WAIS-III):  high average; at least average pre-morbid intellectual ability
  - • tasks that assessed basic attention and working memory be requiring one to

remember multiple pieces of information at once and repeat orally presented numbers forward and then in reverse sequence (WAIS-III Digit Span): very superior range
- visually presented information: average range to low-average range
- tasks of fine motor speed and dexterity: mildly impaired range
- tasks involving learning words (CVLT-II): low average range to average range
- tasks involving copying visually presented complex figures (RCF): solidly average to mildly impaired
- language skills: very superior range to mildly impaired
- tasks involving problem solving, cognitive flexibility, and conceptual reasoning: mildly impaired range
- emotional functioning: moderate to severe levels of depression and anxiety
- reported symptoms consistent with people who have OCD
- self-report on measure of personality and emotional functioning: prone to develop crises that may consume all energy; some inconsistencies in responses
- diagnosis:
  - Axis I: obsessive compulsive disorder; social phobia; major depressive disorder
  - Axis III: migraines, diabetes mellitus type II, fibromyalgia, GERD
- summary/ recommendations: high average ability according to tests of cognitive functioning; superior range on measures of pure attention and working memory that did not require motor speed or quick processing; performed below average on tasks requiring speed and processing information in timely fashion; greater difficulty with pure motor speed and fine dexterity of her hands; low memory confidence; significant difficulties in social situations; uses idiosyncratic methods to aid memory; appears to have very pervasive OCD that includes obsessive doubting

10/2/08
- restricted affect; depressed mood; speech - logical, relevant, fluent; trying to stay with her diet
- plan: neurobehavioral evaluation; daily walking exercises

10/14/08
- physical exam: appears depressed
- assessment/plan: chronic daily headache improving; memory complaints due to combination of medications

10/23/08
- physical exam: well-developed and nourished; pleasant but slightly ad; no acute distress
- impression/plan: institute insulin


**Radiology Reports, PA VAMC, 2/15/05-8/16/06 (Tr. 229-33)**
2/15/05
- x-ray of bilateral hands
- report: both hands in AP, lateral and oblique views; osseous structures and joint spaces are normally maintained with no evidence of fracture, dislocation or arthritis.  No lytic or blastic lesion is present
- impression: normal hands

4/3/05
- history of numbness down both arms; tender post cervical muscles; r/o radicular pain
- report: cervical spine alignment, vertebral body height, bone density, disk space height, and surrounding soft tissues are unremarkable
- impression: normal cervical spine

8/17/06
- MRI of brain with temporal bones
- impression: area of abnormal signal intensity noted in left frontal parietal subcortical white matter posteriorly suggestive of old infarct; two small areas of abnormal intensity in deep white matter likely related to ischemic microvascular disease; unremarkable IACs

**Radiology Report, PA VAMC, 9/27/07 (Tr. 394)**
- bilateral knee pain with bilateral chondromalacia patella
- impression:
  - history: chondromalacia patella bilaterally
  - mild lateral tilting of both patella consistent with patellar mis-tracking
  - minimal degenerative change with tiny osteophyte off the posterior left patella
  - study is otherwise unremarkable and tibiofemoral joints are well-preserved

**Radiology Reports, PA VAMC, 5/29/08 (Tr. 479-80)**
- heel pain
- impression right foot: unremarkable without interval change, no acute or significant chromic abnormality
- impression left foot: unremarkable without interval change, no acute or significant chronic abnormality; slightly prominent plantar spur seen

**Surgical Note, PA VAMC, 2/6/08 (Tr. 601-05)**
- preoperative diagnosis: plantar fasciitis left heel
- postoperative diagnosis: plantar fasciitis left heel
- procedure: endoscopic plantar fasciotomy left heel

D.    Testimonial Evidence

Testimony was taken at the hearing held on March 21, 2007. The following portions of

the testimony are relevant to the disposition of the case:

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:
Q    How tall are you?
A    Five foot.
Q    How much do you weigh?
A    Right now about 155.
Q    You say right now. Has your weight changed?

A        I'm slowly losing weight.

Q        And why is that?

A        Well, I'm - - I've been diagnosed with diabetes and I have high cholesterol so I'm just trying to - -

Q        You're trying to lose weight?

A        - - get these under control.

          *        *        *

Q        Do you live by yourself or do you live with anybody else?

A        No.  I live with Ronald.  I kind of have the upstairs and he's downstairs.  And then we share the kitchen and the bathroom.

Q        Now you and he were working a farm for awhile there.  Are you still working a farm, or did you - -

A        No.  They - - well, for medical reasons and for economic we had to foreclose - - let them foreclose.

Q        Let them foreclose.  So they did foreclose on your farm?

A        Yes, they did.

          *        *        *

Q        So you live in a house?  It sounds like you're sharing a house?

A        Yeah.  We have - - we are allowed to keep three acres.  So we kept the house and the barn.

          *        *        *

A        I do, but I don't like to drive alone.  I make sure that Ron can go with me.  I have problems concentrating.  If I see something off the road I tend to look at it and then I tend to forget that I'm driving and I've gone off the road several times.  I'm also very tired usually, so. I can't get a good night's sleep at home, but boy, you put me behind the wheel and I can go to sleep, ten minutes.  Just.  But I very rarely go out unless I have to do errands or groceries.

          *        *        *

Q        How far did you go in school?

A        Oh, a couple years of college credits, but it was mostly just like a community college and the little bit of testing they let me do in the Air Force.

Q        Okay.  When were you in the Air Force?

A        From 1986 to 1988.   June of '86 to November of '88.

Q        Have you had vocational training, job related training?

A        No.

Q        No?

A        Except what I got in the Air Force.

Q        Okay.  Okay.  And you're not working now?

A        No.

Q        Now how involved were you in running the farm when you were in the farm? Was that - -

A        I used to milk the cows, raise the heifers, help feed, help with hay a little bit.  I was not born on a tractor like Ron, so I just did the easy stuff.  And oh, you know, help clean up. Keep the place clean and - - that's about it.

Q        How much time were you spending doing that in a typical week, do you think?

A      Wow.  That was a 24-hour a day job because we had cows having calves at all hours and during hay season we were always so busy.  I saw every sunrise and every sunset, so, you know, with a little bit of rest in between.  But, you know, I was working what, from six in the morning until - - like eight at night.

Q      Okay.  And - -

A      And it depended on what time of the year it was - -

Q      - - um-hum.

A      - - whether we had hay or silage or, you know, as opposed to winter time when we just had to keep the cows fed and keep them warm and clean.

Q      Now, and you weren't getting paid for that as such, or?

A      Not really.  I started out just helping him clean and stuff and then when I started working full time I realized - - they let me do the finances and I realized that that place was in such bad shape that I just made sure that I had enough for, you know, I had a vehicle to drive and I took care of my animals, my dogs, and I didn't worry about it.  I just - - really don't need that much stuff.

                    *                    *                    *

Q      Okay.  And you worked for the public library?

A      Yes.  In Moundsville.

Q      Was it for several years it looks like?

A      Yes.

Q      Okay.  And what were you doing there?

A      Circulation.  I was the front desk.  I was taking care of the people that were checking books in and out, helping people find information, putting away books, keeping the shelves straight and organized.

Q      Okay.  And how many years did you do that, do you think?  More or less.

A      I think it was two years.

Q      Two years?

A      I think.  Like I said, my memory is really bad - -

Q      Right, right.

A      - - with dates.

                    *                    *                    *

Q      Okay.  And why did you stop doing that?  Why did you stop working at the library?

A      Well, the farm needed - - I just felt that I wanted to help out on the farm more.  It - - there was so much to do and - - I just wanted to help more.

Q      Okay.  So, I mean, you gave up a job where you had an income basically, and then ended up in a job where you didn't, it sounds like.

A      Yeah.

Q      Yeah.

A      But the job was - - it's hard to explain it.   Like I said, I saw every sunrise and sunset and going up there in the morning and finding a new calf was always, you know, great and I was basically my own boss as far as I knew what needed to be done and I did it and I didn't have to travel.  I had a situation where I had to move and he said, you know, you're welcome to put a dog fence up and live upstairs and that's what I did, so I didn't have to travel to work.  And

23

when I did work at the library I had some problems getting there in the wintertime and for some reason, whenever I drove and the roads were not perfectly clear, I kept thinking I was sliding when I wasn't and I was getting myself in a little bit of trouble there.  Scaring myself and.

Q       Now you've mentioned dogs or a dog.   You still have a dog or dogs?

A       I still have a dog.

Q       A dog?

A       Yeah.

Q       Okay.  Any other animals?

A       Seven cats.

Q       I think I had seen a mention of seven cats.  You still have seven cats?

A       Yeah, I have four in the house and three at the barn.

                              *                    *                    *

Q       So you spend time taking care of them, I guess.

A       Oh, yeah, I feed them, I feed them.

                              *                    *                    *

Q       Now why do you - - why can't you work?

A       Well, besides not being able to drive by myself, because we live about half hour from town, I don't know what I'm going to be - - how do I explain it?  I don't know how I'm going to feel every morning.  With the fibromyalgia, some mornings I get up and it's all I can do just to take care of - - you know, feed the cats and take care of the dogs and then I take my pain medicine and I sit down and rest.  And I may not be able to do much the rest of the day.  Or sometimes I may be able to do light chores for a short amount of time.  You know, like 15 minutes to 30 minutes and then I rest 30 minutes and then as the day went on, my working would get shorter and my rest would get longer.  So I have a hard time sitting in one place for very long because of pain in my knees and my feet.  And my back.  And the same reason, basically, for standing up, which is - - it's hard on my knees and I'm - - I'm usually a little bit dizzy everyday, so sometimes just walking around and turning or going up and down steps can kind of be a little bit of a problem.  But I also too, I've just gotten to where I don't want to leave the house.   I just - - because I don't want to drive and I'm not comfortable around people like I used to be.  And I'm kind of afraid of being touched.  I don't get in lines or crowds or anything like that.  From past problems.  I have a little of - - there's a little bit of problem with the diabetes.  I'm trying to keep it under control, but I do wake up occasionally with blurry vision.

Q       Blurry vision?

A       Yeah.

Q       And you think - - is that because your blood sugar is elevated, do you have any ideas or?

A       I think so.

Q       Okay.

A       I think it's because it gets a little bit high and it does that.  Because that's how I found out I had it in the first place.

Q       When did you find out you had it?

A       It was last year.  Late summer or fall, I believe.

Q       Okay.  And you learned you had it - -

A       Or was it May?  I don't - -

Q      - - what symptoms were you having?  Do you remember?

A      - - I have extreme thirst.  You know, constantly going to the bathroom.  And my vision was just - - I mean, it was gone.  For a couple days it scared me to death.  I could not see anything unless it was within a foot of my face.

Q      I think you said it was blurry?

A      Oh, it was real - -

Q      Yeah.

A      - - I couldn't read.  You know, and my regular glasses, you know, didn't do anything.  And it's just - - it changes.  Sometimes it's okay, sometimes it's blurry, sometimes - - it just - - it's really odd.  But like I said, I do try to keep my blood sugar down, but I still have a little bit of trouble with that.

Q      Do you measure your blood sugar at this point?

A      Yeah, twice a day.

Q      What kind of measurements are you getting?

A      I'm usually staying around - - between 180 and 190.

*        *        *

Q      Yeah.  Are you - - what are - - are you taking any medication for that?  You're not on insulin?

A      No.  I'm on metformin and liberide (Phonetic).  Those might be generic names, I'm not sure.

Q      And with those you're getting these readings of 180, 190 still?

A      Yeah.  It's - - I mean, I go low.  And matter of fact, I've actually gone too low - -

Q      Um-hum.

A      - - and stayed there for two weeks.  I tend to wait before I call my doctor, you know, hoping that it will resolve itself.  And I went for a couple weeks where it got so low and I was eating sugar and I could not get it back up.  I don't know what happened.  But it just kind of resolved itself and shot right back up and - - but yeah, with the medication it can be - - I do have problems going too low.  And then I do have it up in the 80s and 90s - - or 180s and 190s, so it's - - I'm still trying to get that under, you know, when you're supposed to eat and how much you're supposed to eat and.

Q      Okay.  You mentioned something about dizziness.  Are you still having?

A      Yeah.  I have - - now I have dizzy spells everyday.  They're the kind where you'll see me fall over sideways or I have to be very careful going down stairs.  I have to hold both hands on the railing and go down sideways and I can't - - there are times when I cannot look at a computer screen or TV.  For some reason, the movement and the color tends to make me very nauseous and dizzy.  But I have vertigo also, but I consider that more serious.  That's when I get it so bad that I can't move.  I actually have to sit down, keep something close in case I get sick and just stare forward.  I mean, I can't close my eyes, I can't move, I can hardly talk.

Q      And that is still happening?  Or not - -

A      That happens not as often as it did before they figured what it was.  It's apparently Meniere's syndrome.  And it's basically a lot worse on my right side.  That's where I've lost me - - some of my hearing and such but, yeah, I - - now when I have them they usually not - - they're usually like half hour to an hour.  Before I was given medication I had a six-hour stint on my bedroom floor that just scared me to death.  I could not move, I could not talk and I

got so scared and it - - every time one would hit me, I would just about panic.  I mean.

Q        So how often would you say you still have those vertigos?

A        Well, the vertigos are down.  I might have a couple in a week, but they're, like I said, they're shorter.  I can grab some meclizine, some extra meclizine.   I'm supposed to take it three times a day.

Q        Okay.  You're taking medicine kind of on an ongoing basis to prevent it.  But if you actually have one, then you take some more of that?

A        Yeah.

*                        *                        *

Q        And that will end it, more or less or?

A        I'm not sure.  Either they're going away in a shorter time or the medication is helping.  I take other medication everyday.  It's - - he told me it's basically like a water pill.  It's just to help control.

Q        A diuretic.

A        Yeah.  I take that everyday.  Every morning.

Q        For the - - and that's for the Meniere's.  That's - -

A        That's for the - - that's - -

Q        - - okay.  I wasn't sure why.

A        I know if I don't take it for a few days, man, I'll get hit with those spells just right off the bat.  It just - - because I take so much mediation and once in awhile I think well, maybe I don't need something and I go off for a few days and then I find out I'm really wrong.

*                        *                        *

Q        And you hadn't had any of those episodes until at some point they - -

A        You're right.

Q        - - more or less suddenly started and then - -

A        The dizzy spells, you know, I've had those a long time.  I'm always - - not always, but I mean, I'm a little off balance and especially if I don't feel good I'm dizzy more than usual, but - -

Q        - - um-hum.

A        - - as far as the vertigo, no, those hit me - - last - - couple years ago I guess.  It was in '05 or so.

Q        And you saw a neurologist in June of '05 for that.

A        Yeah, I had about four episodes before I got to the doctor and it just scared me to death.  I'm not - - I don't know for sure, but it's possible that that's when I had a stroke.  Because that's the only time I can think that I was down for that long without being able to move or talk.  That six hour stint.  I was scared.  I was really scared.

Q        Are you taking any antidepressants now?

A        Yes.

Q        What are you taking?

A        Not sure.  I have to look at my list.  She just recently changed me and she just recently upped the dosage.  Citalopram hydrobromide.

*                        *                        *

Q        Okay.  And how much do you take of that?

A        40 mg a day.

Q        And you haven't had any - - at least I think you haven't had any kind of counseling or psychiatric per se besides the antidepressants?

A        Well, the VA, all she does is type on a computer.  She doesn't really talk to you or pay attention to you.  She just seems to be in charge of medication.

Q        She is - - do you know what she is?  Is she a psychiatrist there or?

A        She's a psychiatrist.  Dr. Hoosha (Phonetic),

Q        So you basically go to her and have a med check.  You just kind of - -

A        Yeah, about every what, two months or so.

Q        (INAUDIBLE).

A        She lets me babble on for a few minutes, but like I said, she doesn't seem to really pay  much attention.  And until recently I did not have access to anyone to talk to but now they do.  They have one in St. Clairsville, Ohio I can go to.  Her name is Pat, but I don't know her last name.  And we've talked once recently.

Q        So you're going to start seeing a counselor or you have started seeing a counselor?

A        Yeah.  She said just come whenever I feel like talking and - - because I have a tendency for things to kind of hit me at one time and I get real panicky about things and it's nice to be able to talk to her.

                    *                    *                    *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q        The dizzy spells are decreasing.  Are the dizzy spells decreasing like the vertigo is decreasing?

A        No.  No.  The dizzy spells are everyday.

Q        Every - - for how long everyday?

A        Well, they hit me and - - how would you explain it?

Q        Well, how long would you be unable to work in an eight-hour period because of the -

A        You know, for all I know, I could be a little bit dizzy all day, but the fact that I'm sitting down resting most of it, it's when I get up, you know, and start moving around that I'll notice it, you know, every time I get up or every time I turn around or.

Q        Okay.

A        So I'm not - - but they're not like the vertigo spells.  They're different.

Q        You also have migraines?

A        Yeah.

Q        How often do you have those?

A        A couple times a week.

Q        And how long do they last?

A        Those can be half to all day.  Yeah.  They've been.

ALJ        And what are they like?  I mean, do you have sensitivity to light, do you have nausea?

CLMT        My nausea, yeah and the light, the smells.  Just - - it's - - you can actually - - I can feel pain by touching my head.  I mean, it's so painful.  I mean, it almost feels like somebody was beating me on the head with something, but.

BY ADMINISTRATIVE LAW JUDGE:

27

Q        And now are you taking any medication for that, for the migraine?

A        Yes.

Q        What do you take for the migraine?

A        It's called Midrin.

Q        Midrin?  And is that something you take for the migraine when it begins - -

A        Yeah.

Q        - - or is it something you take on an ongoing basis?

A        It's for the migraine when I get them.  They tried to - - they gave me medication to take everyday - -

Q        Um-hum.

A        - - and I was able to take it for three weeks and then for some reason I had a reaction to it.  I started to itch.  I mean, - -

Q        Um-hum.

A        - - everywhere.  My ears, my whole - - I just started itching.  I had to stop.  They wanted me to take Benadryl with it and I just told them I just would rather not take it to be that uncomfortable.

Q        Okay.

A        You know, I just - -

Q        And so does this medication help with the migraine when you start?

                                        *                 *                 *

A        It seems to.  Not all the time, but most of the time.   But it doesn't help right away.  It's kind of a slow - - you know, it's not like, you know, bang, it's gone, which would be nice, but.

Q        Um-hum.  So how long does it take to help?

A        Well, like I said, I can - - I may have to take two doses, so it can take a good bit of my day.  I wouldn't say all day.  Well, I can wake up with a migraine and I can have it until, you know, evening, so yeah, I guess it could.  But I take the Midrin - - you know, you could take anywhere from one pill to two and you can do it twice a day and that's it.  So sometimes I do have to take four in a day to get it to calm down, so.

BY ATTORNEY:

Q        You're also taking Vicodin.

A        That's for pain.  For fibromyalgia pain.  For the pain in my knees.  I'm getting serious pain in my joints recently.

Q        You complain of fatigue?

A        Yeah.  Especially when we were - - I was trying to milk cows and keep the farm running after Ron got hurt and - - for some reason, there were some mornings when I - - things that you take for granted, like walking.  Putting one foot in front of the other.  Or reaching your arms up.  It was hard for me to do.  I mean, I was having a really hard time milking the cows. We - - milked  in a pit so I was below the cow, you know, right at utter, you know, where her utter was, so - - but it's just like - - it feels like I've been shoveling out pens all day.  You know how you get that - - you get real exhausted and your arms are real heavy, and you know, you're just wiped out.  And I would feel that from the time I woke up.  Nowadays I don't have them as often, but I still have them about once a week where I'll have - - it doesn't necessarily last all day, but I'll wake up with it.  I don't know.

ALJ           It being this sense - - feeling of fatigue, you mean, or?

CLMT        Yeah, yeah.  Just, I mean, it's just all I can do to go up and down the steps or, like I said, like to raise my arms or, you know.

BY ATTORNEY:

Q         You indicated to me that Dr. - - your foot doctor said you had neuropathy or radiculopathy, I think it said in the records.

A         Yeah.

Q         But what does that mean?

A         Well, I was having trouble first with my left heel and he said it was some kind of a spur.  And then he gave me orthotics for my shoes saying it was the diabetes and I needed the orthotics.  So I started wearing the orthotics because I was having - - kind of - - shooting pains on the sides of my feet.  Or no, this was the pain in my heel and such.  He was giving me shots.  He ordered the orthotics.  Then I started feeling pain on the sides of my feet.  Like a radiating pain from the top front.  There's some kind of a nerve there on the side of your foot.  He gave me shots for those, and he said the orthotics sometimes cause those.  So I got some - - found some good shoes at Goodwill, Nike's, they had good support.  He said that'd be fine.  He said just try wearing those.  But now I'm getting pain - - how do I explain it?  Besides my left heel, which always hurts, I get pain if I sit too long.  It's almost like your pins and needles except it's much more painful.  It's in kind of the middle of my foot.

Q         Well, you also complained of pain going down your arms?

A         Yeah.  I have - - my hands, my feet and my face go numb occasionally.  And I do have radiating pain down my arms into my hands.  My hands hurt.  I mean, I can't, like even holding the steering wheel, it'll start to hurt real bad in here.  Even after a short time, so.  But my joints and my fingers are really starting to hurt.

Q         Now we have two opinions from Dr. Shope and Dr. Estevez that you're unable to work.   How often did you - - do you still see Dr. Shope?

A         He - - I saw him up until this year.

Q         Okay.

A         He was the VA doctor there.

*          *          *

Q         Okay.  So you saw him over a period of years?

A         Yeah.

Q         Okay.  Dr. Estevez, you've seen him for how long?

A         He's - - I've seen him for years, too, and he agreed about the not being able to work, so.

Q         Okay.  There was a reference that VA doesn't treat fibromyalgia?

A         No, it doesn't.  They don't have anybody that specifically treats fibromyalgia.  When I was diagnosed it was by a rheumatologist.  And then they told me that they wouldn't even see me.  So I - - they sent me to neurology.  So he's the one who's been seeing me for the fibromyalgia and the dizziness and he's the one I see for most of my problems.  My knees.

ALJ           The rheumatologist was at the VA or was it someplace else?

CLMT        Yeah, it was at the VA.

ALJ           A VA rheumatologist diagnosed it but then basically said I don't treat it?

CLMT        Yeah. After a couple months they said they no longer - - he gave me the amitriptyline medication that's supposed to help me sleep. But then after that they said they no longer saw fibromyalgia patients and they sent me to neurology. To the man I'd been seeing anyway for headaches and such, so.

*        *        *

BY ATTORNEY:

Q      He - - Dr. Estevez says you have to spend a lot of time with your legs elevated?

A      Well, if I sit - - like I said, if I sit straight like this for very long, that's when the - - I get pain in my knees and I get pain in my feet. And for some - - and I also have restless leg and sometimes if I - - well, most of the time, if I keep my feet up I don't seem to get hit with the pain so soon. I can sit longer and rest. But I mean, the pain could start within 10 minutes of me sitting somewhere or it could wait.

Q      This dizziness or vertigo, does that limit your ability to bend or (INAUDIBLE)?

A      Yeah.

Q      How so?

A      I've got to be really slow and be careful about what I do. Sometimes if I look up, I will just sort of go over. Bending, you know, after a few times I can - - it can make me dizzy. Turning around can make me dizzy if I'm not really slow and careful then I kind of - - I don't know how you explain it. Little bit something that is moving, you know, and - - but yeah, sometimes I don't think about that.

Q      You - - you're - -

A      I can be standing still and fall over, so I don't know how to explain it.

Q      - - your hand was damaged by a cow.

A      I was hit. Yeah, I was hit. How do you explain it? We got a beef cow in and she was wilder than we thought and she saw me and the panel I was holding and she just ran flat over me. And she threw me and I landed on my hand, my elbow and my shoulder on a side - - concrete sidewalk. And I ran to get the four wheeler to find out where she was going and I couldn't even - - my hand wouldn't work. It just - - it scared me for awhile there.

ALJ        Well, what affects does that have now in your ability to handle things or manipulate things?

CLMT        Well, the pain in my hands, I mean, that - - like I said, I can't even hold onto a steering wheel right sometimes. And it - - carrying things, lifting things - - you know, my hands and my elbow can flare up pretty easy.

BY ATTORNEY:

Q      Well, my question is what effect does the excessive thirst and urination would have on your - -

A      Oh, I'd have to - -

Q      - - being in a work area?

A      - - I'd have to be able to leave. You know, when it's really bad I can go every half hour. So, I mean, or even less than that, but yeah, I'd have to be able to leave where ever I was.

Q      There's a reference to drowsiness related to the medication.

A      Yeah. We haven't pinpointed that yet. If - - when I sit down during the day to rest, for some reason, within the last - - several months, I'm suddenly so tired I can hardly keep

my eyes open.  We're still trying to pinpoint exactly what medication is doing that to me.  I've tried cutting off the muscle relaxant and that doesn't work.  I get up hurting worse than ever and - - I don't know if it's more depression medicine or the Vicodin or.

Q        Now why could you return to the library?

A        Well, like I said before, I'm not comfortable driving.  I don't think I can drive safely.  Kind of the way I put it.  I don't - - I used to be able to be at the front desk and to take care of everybody and now I'm not comfortable with people and - - they probably got new computer systems now and I'm not real good about change.  I have trouble learning new stuff than I used to be.

Q        This wish to not interact with people, you had some sexual abuse when you were a child?

A        Yeah.  Yeah.  My step-father and my older brother abused me when I was a child.

Q        You liked working on a farm?

A        Oh, I loved  it.  Loved it.  Liked working with the animals and getting up early and - - taking care of the baby calves and raising the heifers and it was (INAUDIBLE).

          *         *         *

(The Witness, RON HORR, having been first duly sworn, testified as follows:)

EXAMINATION OF WITNESS BY ADMINISTRATIVE LAW JUDGE:

Q        Okay.  And how long have you known Ms. Yohe?

A        Probably 14 years, 15 maybe.

Q        And she worked on, I guess, it was your farm or?

A        Yes, sir.

          *         *         *

EXAMINATION OF WITNESS BY ATTORNEY:

Q        How has she changed over the last several years in terms of her actions or behavior, things you've noticed?

A        One thing she don't go out among people and stuff like she used to.

          *         *         *

A        She's like depressed I guess you'd call it.

          *         *         *

Q        Okay.  She used to be, as I recall, a pretty organized person?

A        Yeah.  She was real organized.

Q        And now?

A        Helter Skelter kind of.  She'll forget where she put stuff and things - - starts doing stuff then forgets what she's doing and things like that.

Q        You mentioned to me yesterday or the day before that she comes down and walks?

A        Yeah.

Q        Tells us about that.

A        I'll be setting - - well, I kind of stay in a bed like thing and I'll be watching TV and she'll just walking.  The house is just kind of three rooms downstairs and like she just keeps walking in circles.  And after I see her four or five times I ask her what she's doing and she'll say she fought what she was wanting to do.

          *         *         *

Q        What about her balance?

A        She - - well, if she bends down, she'll kind of fall over, and sometimes she'll just be walking and one foot will come up and she'll lean to the side and if she looks up she'll get off balance real quick.

Q        You mentioned when we were talking in there that sometimes she goes outside and she comes back looking tired or?

A        Tired or just plain sick.

Q        Sick?  How so?

A        Just real pale looking and  - - it's like somebody looked like they must had the flu for a week or something.  You know, real awful looking.

                        *                *                *

 (The Vocational Expert, JOHN PANZA, having been first duly sworn, testified as follows:)

        EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q        Do you have enough information in which to base an opinion regarding the claimant's vocational profile?

A        Yes.

Q        What can you tell me about that?

A        The claimant previously was employed as a herdsman, semi-skilled job at the heavy level.  And also was a circulation clerk in the library, semi-skilled job at the light level.

                        *                *                *

Q        Okay.  Assume - - younger individual with more than a high school education and past relevant work semi-skilled.  This person could do - - let's say light work as defined exertionally, 20 pounds occasionally 10 pounds frequently, stand about six hours, sit about six hours - - frequently climb ramps, stairs, never ladders, ropes, scaffolds, frequently balance, stoop, kneel, crouch, crawl - - and avoiding exposure to hazards, needs to avoid exposure to hazards - - and is limited to routine, repetitive activity in a low stress - -

A        I'm sorry, would you - -

Q        - - routine, repetitive activity - -

A        - - yes.

Q        - - in a low stress and a low demand work environment not requiring travel to unfamiliar settings.  With those limitations, could a person do any of the claimant's past relevant work?

A        Could not do the farm work, Your Honor.  And would have been able to do the circulation work.

Q        Okay.  That was consistent with the circulation clerk.  If - - same non-exertional limitations, but let's say the person was limited to sedentary work with a sit/stand - -

A        Reduced to sedentary, you said, Your Honor?

Q        - - yeah.  Sedentary work with a sit/stand option.  That would not be consistent, I assume, with any of her past relevant work?

A        That's correct.

Q        Correct?  Would there be other work such a person could perform?

                        *                *                *

A       Your Honor, considering the hypothetical you've given me for comment, it would be my testimony the jobs would exist in the national economy and also in that of the combined states of Ohio and West Virginia at the sedentary level a position of a surveillance system monitor operator, 300,000 jobs in the national economy and at least 4,300 in the combined states of West Virginia and Ohio.  Also at the sedentary level the position of a order clerk, food and beverage, 259,000 jobs in the national economy and 6,200 jobs in the combined states previously mentioned.  Consistent with the DOT.

Q       Okay.  What kind of tolerance would there be for missing work in doing basically unskilled work, I guess?

A        The usual unwritten policy relative to attendance is that if an individual misses more than one-and-one-quarter days of work per month after the first three months, the probationary period, usually results in termination.

                        *                    *                    *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       What - - generally, what percentage of time do people have to be on task at work?

A       I think here again, one of the unwritten rules, policies or what have you is that an individual is off task more than 10%, that's generally accepted by vocational experts.

                        *                    *                    *


BY ATTORNEY:

Q       Does - - I'm sorry.  You have two jobs, surveillance system monitor and order clerk, were those the two?

A       Yeah.

                        *                    *                    *

Q       Well, do the jobs that you had provided in response to the judge's hypothetical involve any pushing or pulling with hands or feet?

A       Not to any significant degree.

Q       What about a limited ability to hear and understand instructions?  And by that, think of a right-sided hear loss and tenonitis or ringing in the ears.  Would that limit the ability to perform any of the jobs in response to the judge's?

A       Can you be more specific?

Q       Well, what ability is there to - - what requirement is there to receive instructions for the surveillance system monitor?

ALJ             I still don't - - I.

                        *                    *                    *

Q       Did you understand balance to be part of the judge's hypothetical?  Frequently balance?

ALJ             Well, it was mentioned and so I assume.

                        *                    *                    *

Q       Okay.  What requirement to handle is implicit in the jobs that you provided in response to the judge's hypothetical?

A       Well, handling, I'm sure they're writing, they're doing some writing.

Q       Okay.  Anything else?

A     Making notations.  I'm sorry, the question again, I'm sorry.

Q     What requirements are there to handle in the jobs that you provided?

A     Well, you handle papers and documents, things of that nature.

*       *       *

Q     Okay.  What degree of concentration is involved in the surveillance system monitor?

A     What do you mean degree?  You mean 100%?

Q     Low, medium, high?

A     High.

Q     And what does the order clerk do?

A     Order clerk is someone who accepts orders for food and beverages, et cetera.  They're located in restaurants and fast foods, they're located in hotels, they're located in all types of food or concession establishments, et cetera.

Q     And I assume that that person deals with the general public?

A     Yes.

Q     And interacts with the general public?

A     Yes.

Q     In an extensive way?

A     Yes.

REEXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q     I just have one more question.  I just want to show you - - assume you've got a person with the claimant's vocational profile and if you would take a look at exhibit 13F pages 28 and following.  Just an assessment by one of the VA doctors (INAUDIBLE).

*       *       *

BY ADMINISTRATIVE LAW JUDGE:

Q     Would that be consistent with work?  I mean, I assume - - it looks to me, like I said, most of range of sedentary work, so it wouldn't be consistent with her past relevant work, I don't think.

A     That's correct.

Q     So would it be consistent with any work?

A     Well, here again, I think it would depend upon how many times the person had to elevate the legs above the heart.

Q     All right.

A     Or how many ti - - how much rest must the individual have by resting or reclining or lying down, too.  And it's not specific here, Your Honor.

Q     Okay.  So it's not quantified enough - -

A     Right.

Q     If a person needed to elevate their legs above chest level on a fairly regular basis, that would not be consistent with work.

A     It's not practical.

*       *       *

E.     <u>Lifestyle Evidence</u>

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life:

- takes care of pets (Tr. 77, 78, 100)
- checks woodstoves (Tr. 77)
- helps to bring in firewood (Tr. 77)
- does light farm work (Tr. 77)
- has trouble falling and staying asleep (Tr. 78, 100)
- has no problems with personal hygiene (Tr. 78, 100)
- sometimes needs reminders to take medicine (Tr. 79, 101)
- prepares own meals (Tr. 77, 79, 101)
- does house work (Tr. 77, 79, 101)
- drives but has some trouble (Tr. 80, 102, 613)
- sometimes need someone to go out in public with her (Tr. 80, 102)
- shops for groceries, household items, and gifts (Tr. 80, 102)
- able to pay bills, count change, handle a savings account, and use a checkbook/money order (Tr. 80, 102)
- slight difficulty balancing checkbook (Tr. 81, 103)
- watches television daily (Tr. 81, 103)
- reads, plays with her animals, plays easy video games (Tr. 81, 103)
- does not like to socialize with others (Tr. 81, 103)
- has very little contact with family (Tr. 82, 104)
- follows written instructions well (Tr. 82, 104)
- has trouble remembering spoken instructions (Tr. 82, 104)
- has a short attention span (Tr. 82, 104)
- has no trouble getting along with authority figures (Tr. 83, 105)
- does not handle stress well (Tr. 83, 105)
- does not handle changes in routine well (Tr. 83, 105)
- has note cards to remind her to pay bills (Tr. 103)
- surfs the internet (Tr. 103)

### III. The Motions for Summary Judgment

A. <u>Contentions of the Parties</u>

Claimant argues that the ALJ's decision to deny the Claimant SSI and DIB is not supported by substantial evidence because the ALJ included frequent balancing in the RFC, Claimant does not have the ability to perform the jobs provided by the VE, the ALJ improperly

evaluated the opinions of treating sources, the ALJ ignored Claimant's worsening fibromyalgia and Meniere's disease conditions, the ALJ improperly evaluated Claimant's credibility, the ALJ failed to properly analyze Claimant's impairments under the listings, and the ALJ failed to indicate that he adequately considered witness testimony.

Commissioner contends that substantial evidence supports the ALJ's decision that Claimant is not disabled. Specifically, Commissioner contends that the ALJ properly included balancing in the RFC, Claimant maintains the ability to perform the jobs listed by the VE, the ALJ properly evaluated the treating sources, the evidence of record does not support a claim that Claimant's fibromyalgia and Meniere's disease worsened, the ALJ properly evaluated Claimant's credibility, the ALJ properly analyzed the listings, and the ALJ properly considered the testimony of Claimant's witness.

B.      Discussion

1.      Whether Substantial Evidence Supports a Finding that Balancing be Included in Claimant's RFC.

Claimant seems to argue that the ALJ erred by including frequent balancing in the RFC. Specifically, Claimant argues that this inclusion was contrary to Claimant and witness testimony as well as medical evidence of record. Commissioner contends that the ALJ did not err by including balancing in the RFC for two reasons. First, any inability to balance was presumably due to vertigo, which Claimant consistently reported was well-controlled by medication. Second, Commissioner argues that even assuming Claimant's vertigo was not controlled by medication, the two jobs listed by the VE do not require balancing.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence"

is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

A Residual Functional Capacity is what Claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether claimants are disabled but is used as the basis for determining the particular types of work claimants may be able to do despite their impairments. Id.

Here, the ALJ included balancing in Claimant's RFC. Claimant argues this inclusion was inconsistent with the medical record as well as testimony. This Court cannot say that the ALJ's RFC finding was not supported by substantial evidence. On five separate occasions Claimant

reported that her vertigo episodes, which caused the balancing problems, were controlled

through medication.[5]  Additionally, Claimant failed to report any problems with balancing or

vertigo episodes during most of her hospital visits.  Finally, as Claimant indicates, the ALJ states

in his decision that the state agency medical physician and disability examiner precluded

Claimant from balancing.[6]  However, the ALJ was mistaken.  The state agency medical

physician and disability examiner actually indicated that Claimant could perform work that

included frequent balancing.  (Tr. 291).  Therefore, the state agency medical physician and

disability examiner's report actually supports the inclusion of balancing in the RFC.

      Accordingly, substantial evidence existed to include balancing in the RFC.

2.      Whether Substantial Evidence Supports the ALJ's Finding that Claimant Retained the Ability to Perform the Jobs Given by the VE.

      Claimant argues that substantial evidence does not exist to support a finding that she is

able to perform the jobs listed by the VE.  Specifically, Claimant argues that she cannot perform

the job of surveillance system monitor because she does not have the ability to maintain

concentration, becomes drowsy during the day, and becomes nauseated when looking at a

computer screen or television.  Claimant also argues that she cannot perform the job of order

clerk because the job requires extensive interaction with the general public, in which she is

---

[5] First, on September 15, 2005, Claimant admitted to vertigo "which is much, much better since she has been on the acetazolamide."  (Tr. 165).  Second, on October 18, 2005, Claimant reported that her "vertigo episodes have resolved substantially with Diamox.  (Tr. 160).  Third, on April 19, 2006, Claimant reported "episodes of vertigo have decreased in severity since starting acetazolamide."  Fourth, on April 10, 2007, Claimant's chief complaint was vertigo and migrainous headaches; however, Claimant reported that "vertigo is under reasonable control with Diamox and meclizine."  Finally, on July 7, 2007, Claimant reported that "vertigo is controlled on the most part by acetazolamide."

[6] Pl. Br. P. 16.

markedly limited.

Commissioner contends that substantial evidence does support the findings. First, Commissioner argues that Claimant was found not to have an attention deficit disorder, which suggests she displayed no significant inability to maintain attention. Commissioner next argues that Claimant's testimony regarding her drowsiness is inconsistent and Claimant's testimony that she becomes nauseated when looking at a computer screen is not supported by the evidence of record. Commissioner also contends that substantial evidence supports Claimant's ability to perform the job of order clerk because the relevant medical evidence of record is inconsistent as to Claimant's ability to interact with the general public. Additionally, Commissioner contends, the degree to which Claimant would deal with the general public as an order clerk is relatively limited and in low-stress and low-demand environments.

This Court cannot say that substantial evidence does not exist to support a finding that Claimant can perform the tasks associated with surveillance system monitor. First, Claimant relies on statements suggesting Claimant has trouble sleeping. The statements upon which Claimant relies, however, were made on July 15, 2005, prior to the onset date of November 1, 2005. Second, Claimant cites a Mental RFC Assessment to support her contention that she is unable to maintain concentration for extended periods. Dr. Allen concludes this report stating that Claimant does have impairments that "adversely impact several work related functional domains (see notations above) but the claimant retains emotional and mental functioning such that she is able to work in settings of low pace, and which do not involve travel to unfamiliar places." (Tr. 251). Additionally, in that same report, Claimant was found not to have any significant limitation in understanding, remembering, carrying out simple and detailed

instructions, sustaining ordinary routines without supervision, and making simple work-related decisions.  (Tr. 249).  Finally, Claimant relies on her own testimony that she may become nauseated when looking at a computer screen.  Claimant asserts that she is entitled to rely upon this statement because the ALJ found her credible.  A full credibility analysis is below in section 5; however, even taking Claimant's statement as true, there still exists substantial evidence to support a finding that Claimant retains the ability to concentrate in order to perform the job of a surveillance system monitor.

The Court also cannot say that substantial evidence does not exist to support a finding that Claimant retains the ability to perform the job of order clerk.  Again, Claimant relies on a Mental RFC Assessment to support her contention that she does not have the ability to perform the tasks, specifically interacting with the general public, required for order clerks.  Though the RFC does find that Claimant is markedly limited in his ability to interact with the general public, Claimant is found not significantly limited, or without limitation, in his ability to ask questions, accept instructions and respond to criticism, associate with coworkers, and maintain socially appropriate behavior.  (Tr. 250).  Additionally, despite finding that Claimant "has credible evidence in file to support severe mental impairments consisting of panic with agoraphobia and major depression," Dr. Allen found, as indicated fully above, that the impairments do not affect Claimant to such an extent that she is unable to work in low pace settings that involve no travel to unfamiliar places.  (Tr. 251).  Finally, in a subsequent Mental RFC Assessment, Dr. Comer found Claimant to be only moderately limited in her ability to interact with the general public and found Claimant's functional capacity limitations as moderate with the mental emotional capacity for routine/ repetitive activity in a low-stress work environment.  (Tr. 287).  Essentially,

Dr. Comer's statements were consistent with those of Dr. Allen, and there is substantial evidence to support a finding that Claimant retains the ability to perform the job of order clerk.

3.      Whether the ALJ Properly Evaluated the Medical Evidence of Treating Physicians

Claimant argues that the ALJ failed to properly analyze and give appropriate weight to the opinions of Claimant's treating physicians. Commissioner contends that the ALJ correctly analyzed each opinion and applied the appropriate weight.

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id. The opinion of claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. Evans, 734 F.2d at 1015. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). While the credibility of the opinions of the treating physician is entitled to great weight, it may be disregarded if there

is persuasive contradictory evidence.  Evans, 734 F.2d at 1015.  To decide whether the

impairment is adequately supported by medical evidence, the Social Security Act requires that

impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory

diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20

C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295,

297 n.1 (4th Cir. 1990).  Courts evaluate and weigh medical opinions pursuant to the following

non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment

relationship between the physician and the applicant; (3) the supportability of the physician's

opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a

specialist.  20 C.F.R. § 404.1527 (2005).  Courts often accord "greater weight to the testimony of

a treating physician" because the treating physician has necessarily examined the applicant and

has a treatment relationship with the applicant.  Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir.

2001).  However, "although the treating physician rule generally requires a court to accord

greater weight to the testimony of a treating physician, the rule does not require that the

testimony be given controlling weight."  Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.

1992) (per curiam)).

  A.  Dr. Shoff

   Claimant argues that the ALJ erred in failing to consider that Dr. Shoff, a treating

physician, noted the severity of Claimant's impairments by writing a note asking Claimant be

excused from work.  Claimant states that this statement was made in October 2005, and Dr.

Shoff stated eight months later that Claimant had uncontrolled fibromyalgia.  Commissioner

contends that Dr. Shoff's statement from October 2005 should be disregarded because it was

made prior to Claimant's onset date and the relevant time period. Alternatively, Commissioner argues that even if the statement was in the relevant time period, the statement considered Claimant's disabled status, which is an issue reserved to the ALJ.

Claimant cites Tr. 312 for both the October 2005 statement and the statement made eight months later. Page 312 is a copy of a note dated June 13, 2006, from Dr. Shoff stating that "patient has fibromyalgia which is not controlled and is currently disabled indefinitely until condition improves." (Tr. 312). While this note does relate to the relevant time period, the note determines Claimant's disabled status, which is an issue reserved specifically to the ALJ. Therefore, the ALJ did not err in failing to consider Dr. Shoff's disability determination.

B.    Dr. Estevez

Claimant argues that the ALJ erroneously gave dispositive weight to the finding that Dr. Estevez failed to indicate how many times Claimant needed to lay down and elevate her feet per day. Additionally, Claimant argues that the ALJ erred by finding that the limitations listed by Dr. Estevez were generally consistent with sedentary work. Arguing that Dr. Estevez's findings were inconsistent with sedentary work, Claimant relies on a statement made by Dr. Estevez that Claimant's "history of fibromyalgia and vertiginous episodes . . . were incapacitating in nature."[7] Commissioner contends that Dr. Estevez's limitations were consistent with the ALJ's assessment, and to the extent that the ALJ did not fully adopt Dr. Estevez's limitation, the ALJ provided some limitation on the activity. Finally, the Commissioner contends that substantial evidence does not support Claimant's assertion by Dr. Estevez that her history of fibromyalgia and vertigo episodes are incapacitating in nature.

_____

[7] Pl. Br. P. 21.

The ALJ did not err in evaluating Dr. Estevez's records. First, that the ALJ gave dispositive weight to Dr. Estevez's failure to indicate the number of times Claimant would need to lay down to elevate her feet during the day is irrelevant. Dr. Estevez's evaluation is dated October 23, 2004, and therefore falls outside the relevant period.

Additionally, the ALJ's conclusion that Dr. Estevez's findings were consistent with sedentary work is not erroneous. This Court is not tasked with weighing facts to determine a claimant's disabled status. The Court's only job is to determine whether substantial evidence exists to support the ALJ's decision. Claimant cites no authority supporting her contention that the ALJ erred in his factual determination, and this Court cannot say that the ALJ's decision was not supported by substantial evidence. The ALJ cited Dr. Estevez's findings that Claimant could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, and stand and/or walk two hours in an 8-hour workday and concluded that these findings were consistent with sedentary work. (Tr. 25). The ALJ evaluated Dr. Estevez's determinations and used it in forming his decision. There was no error.

C.      Dr. Ahuja

Claimant argues that the ALJ erred by failing to consider Dr. Ahuja's treatment notes and by not specifically discussing her statement that Claimant's balance problem and vertiginous disorder were ongoing problems. Commissioner contends that the ALJ did consider Dr. Ahuja's treatment notes and that the ALJ did not specifically cite Dr. Ahuja's statement that Claimant's balance and vertiginous disorder were ongoing problems is irrelevant.

As Claimant articulates, an ALJ is not required to make a written evaluation of every piece of evidence, so long as the ALJ articulates at some minimum level his analysis of a

particular line of evidence.  <u>Green v. Shalala</u>, 51 F.3d 96, 101 (7th Cir. 1995).  However, the

ALJ's mere failure to cite specific evidence does not establish that he failed to consider it.  <u>Black</u>

<u>v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998).  Claimant has an extensive medical record including

hundreds of pages in Progress Notes from the Pittsburgh Veterans Administration Medical

Center.  Dr. Ahuja's notes are included in Exhibits 2F, 11F, 12F, 13F, and 14F, which the ALJ

cites numerous times throughout his decision.  That the ALJ did not specifically cite Dr. Ahuja's

individual reports does not indicate that he failed to consider them.

 Additionally, while the opinion of a claimant's treating physician is entitled to great

weight, it is not required to be given controlling weight if it is not well-supported by medical

evidence and is inconsistent with other relevant medical evidence of record.  20 C.F.R.

§416.927(d)(2).  Claimant argues that the ALJ failed to consider Dr. Ahuja's statement that

Claimant's balance problem and vertiginous disorder were ongoing problems.  As indicated

above, the ALJ did consider Dr. Ahuja's statement; moreover, he was not required to give

controlling weight to the statement because the ALJ cites medical evidence in direct

contradiction to Dr. Ahuja's contention.  The ALJ cites, on numerous occasions throughout the

decision, medical records indicating that Claimant's Meniere's disease, which has as side effects

balance problems and vertigo,  is controlled by medication.  (Tr. 21, 22, 25).  Therefore, the ALJ

did not err in failing to give great weight to Dr. Ahuja's specific statement that the symptoms

were ongoing problems.

4.  Whether Substantial Evidence Supports a Finding that Claimant Experienced Worsening
  Symptoms of both Fibromyalgia and Meniere's Disease During the Relevant Time
  Period.

 Claimant argues that substantial evidence exists to show that Claimant's impairments

arising from fibromyalgia and Meniere's disease worsened during the relevant period. Commissioner contends that the medical evidence of record shows that Claimant's impairments actually improved.

It is not within the province of the Court to weigh the facts to determine a claimant's disabled status. The Court must only determine whether substantial evidence exists to support the ALJ's finding. Claimant argues that the medical evidence shows that Claimant's fibromyalgia and Meniere's disease worsened during the relevant time. However, the ALJ, citing multiple medical records indicating exactly the opposite, concluded that Claimant's conditions improved over time. (Tr. 21, 22, 25). Accordingly, the Court is unable to conclude that substantial evidence did not exist to support a finding that Claimant's condition improved.

5.      Whether the ALJ Correctly Evaluated Claimant's Credibility.

Claimant seems to argue that the ALJ improperly evaluated Claimant's credibility because he required objective evidence. Commissioner contends that substantial evidence exists to support the ALJ's determination that Claimant's subjective complaints were not fully credible. Specifically, the Commissioner cites Plaintiff's daily activities, effectiveness of her medications, and subjective statements to support the contention that the ALJ properly discredited Claimant.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements

46

about his symptoms, in determining whether the claimant is disabled.  Id. at 595.  While the ALJ

must consider the claimant's statements, he need not credit them to the extent they are

inconsistent with the objective medical evidence or to the extent the underlying objective

medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.


"Because he had the opportunity to observe the demeanor and to determine the credibility

of the claimant, the ALJ's observations concerning these questions are to be given great weight."

Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp.

776 (E.D. Va. 1976)).  "Because hearing officers are in the best position to see and hear the

witnesses and assess their forthrightness, we afford their credibility determinations special

deference."  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  "We will reverse an

ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers

v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir.

1990)).

Claimant alleges that the ALJ required Claimant to provide objective evidence, which is

not required under the law of this Circuit.  Relying on Hines v. Barnhart, 453 F.3d 559 (4th Cir.

2006), Claimant argues that she is entitled to rely solely on subjective evidence.  Claimant is

mistaken.  Though the Court in Hines found that the claimant was entitled to rely exclusively on

subjective evidence, the Court noted that:

> While objective evidence is not mandatory at the second step of the test, [t]his is
> not to say, however, that objective medical evidence and other objective evidence
> are not crucial to evaluating the intensity and persistence of a claimant's pain and
> the extent to which it impairs her ability to work.  They most certainly are.
> Although a claimant's allegations about her pain may not be discredited solely
> because they are not substantiated by objective evidence of the pain itself or its

> severity, *they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment*, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d, at 565 (emphasis added) (citing Craig, 76 F.3d at 595). Therefore, claimants are not automatically entitled to rely exclusively on subjective evidence to show that they are unable to perform work eight hours per day, five days per week. Additionally, the claimant in Hines suffered from sickle cell anemia. As the Court noted, sickle cell anemia "is particularly insidious because it rarely produces the objective medical evidence that clinicians desire. . . there is no way to demonstrate objectively that a SCD patient has pain . . . ." Id. at 561. "Given the unique characteristics of the disease at issue in this case," the Court held that the ALJ erred. Unlike the claimant in Hines, Claimant is not suffering from a disease that rarely produces objective medical evidence. Therefore, the ALJ is permitted to evaluate the subjective allegations in accordance with the objective medical evidence.

The ALJ complied with all applicable Fourth Circuit law in concluding evaluating Claimant's subjective complaints of her pain. First, the ALJ concluded that Claimant "has impairments that can cause symptoms such as pain, fatigue, and decreased concentration." (Tr. 24). The ALJ then engages in a discussion to support his conclusion that Claimant's testimony was not supportive of a finding of disability. In accordance with the Court's language in Hines, the ALJ considered both Claimant's testimony and the objective medical evidence of record. The ALJ states that despite being diagnosed with fibromyalgia in 1993, Claimant continued to work. (Tr. 24-25). Additionally, the ALJ notes that the medical evidence of record indicates that Meniere's disease is controlled by medication and Claimant has only mild restriction in her daily activities (Tr. 22). Finally, the ALJ states that "the record as a whole suggests that she

remains able to perform work-like functions such as sitting, standing, walking, lifting light items, and concentrating to the extent of being able to complete simple tasks." (Tr. 24).

Accordingly, the ALJ did not err in his credibility analysis.

6.      Whether the ALJ Failed to Properly Evaluate and Analyze the Listings.

Claimant argues that the ALJ's analysis under the listings for fibromyalgia was insufficient because the ALJ stated only that the listings do not contain a specific listing for fibromyalgia. Claimant next argues that the ALJ erred when he failed to analyze fibromyalgia under Listing 14.06 for undifferentiated connective tissue disease. Commissioner contends that the ALJ correctly found that no listing exists for the impairment of fibromyalgia and that Claimant cites no clinical or diagnostic evidence to suggest that her impairment equaled the requirements under 14.06.

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990). Claimants bear the burden of proving their disability meets the requirements of a listing. Green v. Chater, 64 F.3d 657 (4th Cir. 1995); see also Zatz v. Astrue, 2009 WL 3198743 at 3 (7th Cir. 2009). To meet Listing 14.06 for undifferentiated and mixed connective tissue disease, the claimant must provide clinical evidence to show the "involvement of two or more organs/body systems, with: 1. One of the organs/body systems involved to at least a moderate level of severity; and 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.06.

To address Claimant's first contention, the ALJ did not err by simply stating that there is

no specific listing addressing impairments from fibromyalgia. "A person with a condition of fibromyalgia certainly could have serious enough pain to have a disability under the Social Security Act, but the condition does not automatically qualify as a listing level impairment." Bartyzel v. Commissioner of Social Security, 74 Fed. Appx. 515, 527 (6th Cir. 2003). Second, though a claimant may show that his/her fibromyalgia meets all requirements outlined in the impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.06, Claimant failed to provide any clinical or diagnostic evidence to demonstrate that her fibromyalgia met each of the requirements under § 14.06. Because fibromyalgia itself is not a listing and Claimant failed to carry its burden to meet all requirements of § 14.06, the ALJ did not err in his analysis of the listings.

7.      Whether the ALJ Properly Considered the Testimony of Claimant's Witness.

Claimant argues that the ALJ erred in his analysis of the testimony of Claimant's witness because the ALJ neglected his testimony about Claimant's "ritualistic walking in circles." Commissioner contends that the ALJ clearly considered the witness's testimony as indicated by the ALJ's summary of the testimony in the decision. Additionally, Commissioner contends that Claimant cited no authority for her proposition that the ALJ inadequately considered the witness's testimony.

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). "One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence." Id. Claimant's companion, Mr. Horr, whom Claimant has known for 14

years, testified to Claimant's impairments at the ALJ's hearing. Primarily, Mr. Horr testified to Claimant's current mental and physical state in relation to her work habits. The ALJ properly considered Mr. Horr's testimony. The ALJ recognized the longstanding relationship Mr. Horr has had with Claimant and noted that Mr. Horr believes Claimant "does not go out and spend time among other people like she used to . . . is not a workaholic like she used to be . . . is depressed and is not as organized." (Tr. 24). Mr. Horr also testified to Claimant's forgetfulness and lack of balance. (Tr. 24).

Though not done specifically, the ALJ discounted Mr. Horr's opinions by citing conflicting medical evidence. See Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995) (finding that the ALJ did not err in discrediting the witness's testimony because "it is evident that most of [the witness's] testimony concerning [the claimant's] capabilities was discredited by the same evidence that discredits [the claimant's] own testimony concerning his limitations"). From the decision, it is apparent that the ALJ discounted Mr. Horr's testimony using the same medical evidence used to discredit Claimant. Moreover, Claimant cites no authority to suggest that the ALJ's analysis was flawed. Accordingly, the ALJ did not err.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** because there was substantial evidence to support the ALJ's determination that balancing be included in Claimant's RFC, Claimant maintained the ability to perform the jobs listed by the VE, and Claimant's fibromyalgia and Meniere's disease did not worsen during the relevant period, and the ALJ properly evaluated the medical evidence of record, Claimant's credibility, the relevant

listings, and the testimony of Claimant's witness.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: December 14, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE